Electronically Filed
7/30/2025 3:40 PM
Third Judicial District, Canyon County
Rick Hogaboam, Clerk of the Court
By: Maria Bravo, Deputy Clerk

Eric S. Rossman, ISB #4573
erossman@rossmanlaw.com
Erica S. Phillips, ISB #6009
ephillips@rossmanlaw.com
Mallam J. Prior, ISB #10938
mprior@rossmanlaw.com
ROSSMAN LAW GROUP, PLLC
350 N. 9th Street, Suite 500
Boise, Idaho 83702
Telephone: (208) 331-2030
Facsimile: (208) 947-2424
*iCourt efiling only!:* rlg@rossmanlaw.com

Attorneys for Plaintiffs

## IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT OF

## THE STATE OF IDAHO, IN AND FOR THE COUNTY OF CANYON

CV14-25-08691

| | |
|---|---|
| AARON COLEMAN and MENDY COLEMAN, Husband and Wife, ) ) ) | CASE NO. _____ |
| Plaintiffs, ) ) | **SUMMONS** |
| -vs- ) ) | |
| SIG SAUER, INC., a Delaware Corporation; ) PALMETTO STATE ARMORY, LLC, a ) South Carolina limited liability company; ) and DOES I-X, unknown parties, ) ) | |
| Defendants. ) | |

**NOTICE: YOU HAVE BEEN SUED BY THE ABOVE-NAMED PLAINTIFF(S).** THE COURT MAY ENTER JUDGMENT AGAINST YOU WITHOUT FURTHER NOTICE UNLESS YOU RESPOND WITHIN 21 DAYS. **READ THE INFORMATION BELOW.**

TO:  SIG SAUER, INC.
     72 Pease Boulevard
     Newington, NH 03801

SUMMONS - 1

TO:    PALMETTO STATE ARMORY, LLC
       Registered Agent: InCorp Services, Inc.
       317 Ruth Vista Road
       Lexington, SC 29073

You are hereby notified that in order to defend this lawsuit, an appropriate written response must be filed with the above designated court at 1115 Albany Street, Caldwell, Idaho 83605, (208) 454-7572, within 21 days after service of this Summons on you.  If you fail to so respond the court may enter judgment against you as demanded by the plaintiff(s) in the Complaint.

A copy of the Complaint is served with this Summons.  If you wish to seek the advice or representation by an attorney in this matter, you should do so promptly so that your written response, if any, may be filed in time and other legal rights protected.

An appropriate written response requires compliance with Rule 10(a)(1) and other Idaho Rules of Civil Procedure and shall also include:

1.    The title and number of this case.

2.    If your response is an Answer to the Complaint, it must contain admissions or denials of the separate allegations of the Complaint and other defenses you may claim.

3.    Your signature, mailing address and telephone number, or the signature, mailing address and telephone number of your attorney.

4.    Proof of mailing or delivery of a copy of your response to plaintiff's attorney, as designated above.

To determine whether you must pay a filing fee with your response, contact the Clerk of the above-named court.

\

\

**SUMMONS - 2**

7/30/2025 3:40 PM

DATED: _____.

Clerk of the Court

Deputy  *Maria C. Bravo*

Z:\Work\C\Coleman. Aaron\Pleadings\Summons.d

SUMMONS - 3

Electronically Filed
7/30/2025 3:40 PM
Third Judicial District, Canyon County
Rick Hogaboam, Clerk of the Court
By: Maria Bravo, Deputy Clerk

Eric S. Rossman, ISB #4573
erossman@rossmanlaw.com
Erica S. Phillips, ISB #6009
ephillips@rossmanlaw.com
Mallam J. Prior, ISB #10938
mprior@rossmanlaw.com
ROSSMAN LAW GROUP, PLLC
350 N. 9th Street, Suite 500
Boise, Idaho 83702
Telephone: (208) 331-2030
Facsimile: (208) 947-2424
*iCourt efiling only!:* rlg@rossmanlaw.com

Attorneys for Plaintiffs

## IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT OF

## THE STATE OF IDAHO, IN AND FOR THE COUNTY OF CANYON

| | |
|---|---|
| AARON COLEMAN and MENDY COLEMAN, Husband and Wife, <br><br> Plaintiffs, <br><br> -vs- <br><br> SIG SAUER, INC., a Delaware Corporation; PALMETTO STATE ARMORY, LLC, a South Carolina limited liability company; and DOES I-X, unknown parties, <br><br> Defendants. | CASE NO. ___CV14-25-08691___ <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> Fee Category: AA <br> Filing Fee: $221.00 |

COME NOW, the above-named Plaintiffs, Aaron and Mendy Coleman, and for cause of action against Defendants, hereby COMPLAIN AND ALLEGE as follows:

## PARTIES

1.    Plaintiffs Aaron and Mendy Coleman at all times herein mentioned have been and are adult individuals, citizens, and residents of the State of Idaho, residing in Canyon

COMPLAINT AND DEMAND FOR JURY TRIAL - 1

County. Mr. Coleman served with distinction in the United States Coast Guard, has been employed as a police officer for the Nampa Police Department for 24 years, is part of the Nampa Police Department master patrol, a trainer for the past 12-14 years, and has extensive training and experience in the safe use of firearms.

2.      Defendant Sig Sauer, Inc. ("Sig Sauer") at all times herein mentioned was and is a Delaware corporation, with its principal place of business at 72 Pease Boulevard in Newington, New Hampshire 03801, authorized to conduct business within the State of Idaho. Sig Sauer was formerly known as SIG SAUERARMS Inc. and changed its name to Sig Sauer, Inc. in October 2007. Its Chief Executive Officer at all times relevant to this Complaint was Ron J. Cohen. Sig Sauer purposefully established significant contacts in Idaho, and has carried out, and continues to carry out substantial, continuous, and systematic business activities in Idaho, specifically in Canyon County. At all relevant times, Sig Sauer was acting by and through its employees, servants, and agents, acting within the course and scope of their employment, service and agency. Sig Sauer designs and manufactures firearms for sale to military and commercial markets in the State of Idaho, throughout the United States, and internationally. It markets and sells its products directly and through dealers, like Palmetto State Armory, LLC.

3.      Defendant Palmetto State Armory, LLC ("Palmetto State Armory") at all times herein mentioned was and is a South Carolina limited liability company authorized to conduct business within the State of Idaho.

4.      The true names of Does I - X are unknown. Each of the Defendants, including the Doe Defendants, is or may be responsible in some manner for Plaintiffs' damages, either directly or through the acts and omissions of their agent and employee, and each is or may be

COMPLAINT AND DEMAND FOR JURY TRIAL - 2

the agent and/or employee of the others. Plaintiffs will move the Court to allow amendment when the identities and roles of the Doe Defendants become known.

## JURISDICTION AND VENUE

5.    The Court has jurisdiction over this matter pursuant to Idaho Code §§ 1-705 and 5-514.

6.    Venue is proper, pursuant to Idaho Code § 5-404 as this cause of action arose within Canyon County.

## GENERAL ALLEGATIONS

*Sig Sauer's P320*

7.    Sig Sauer designs, manufactures, and markets the P320.

8.    The Sig Sauer P320 is a striker-fired, semi-automatic pistol. This means there is no hammer present. When the slide is racked back and released forward, the firing pin remains back and under spring tension. The trigger releases this tension and allows the pin to push forward resulting in firing the round in the chamber. Because there is no hammer to cock or release, the trigger pull is incredibly easy to pull and has low pull-weight.

9.    Sig Sauer's P320 does not have a tabbed trigger safety/trigger toggle. A trigger toggle is a small tab in the face of the trigger that must be fully depressed for the trigger to move rearward and fire the pistol.

10.    Sig Sauer's lack of trigger toggle on the P320 is a material deviation from the industry standard. Other manufacturers of striker-fired pistols include trigger toggles as an added safety feature. Other striker-fired pistols (Glock, CZ P10C, Heckler & Koch VP9, Smith & Wesson M&P, Walther PPQ) all contain some form of safety that is either a trigger toggle or a manual safety.

COMPLAINT AND DEMAND FOR JURY TRIAL - 3

11.    Sig Sauer's design of the P320 eliminating the trigger toggle means that the P320 does not have any external safety features, whether a trigger toggle or a manual safety.

12.    The absence of these external safety features causes and/or contributes to the P320 being more susceptible than its counterparts to un-commanded discharges, i.e., discharges where there is no trigger pull or where a foreign object contacts the P320 trigger resulting in an un-commanded discharge.

13.    No Sig Sauer P320, as of the manufacture date of any P320 involved in this action, was equipped with a tabbed trigger safety.

14.    No Sig Sauer P320, as of the manufacture date of any P320 involved in this action, was equipped with a grip safety.

15.    No Sig Sauer P320, as of the manufacture date of any P320 involved in this action, was equipped with a manual safety.

16.    Sig Sauer's P320s also contain a manufacturing defect known as a rollover. This defect allows the striker foot to slip off the sear. Due to this defect, sudden or gradual vibration can make the striker foot walk off the sear, leading to an un-commanded discharge.

17.    Sig Sauer's P320s require less work to pull the trigger than other similar guns in the industry (i.e., XD 9, M&P 9mm, Glock 17g5). Requiring less work to pull the trigger of a gun without any external safety renders the P320 defective and unreasonably dangerous as it is more susceptible to un-commanded discharges compared to other similar guns in the industry.

18.    Sig Sauer's P320's trigger is also susceptible to being depressed from angles which cannot be achieved with other similar guns in the industry (i.e., XD 9, M&P 9mm, Glock 17g5). The Sig Sauer P320 trigger has a larger trigger actuation surface area compared to other

COMPLAINT AND DEMAND FOR JURY TRIAL - 4

similar guns in the industry. This results in the P320 trigger being depressed by foreign objects or otherwise from contact on the sides of the trigger. Similar guns in the industry cannot be actuated from these same angles and require force over the face of the trigger to be actuated. The P320's trigger actuation from angles other than across the face of the trigger renders the P320 defective and unreasonably dangerous as it is more susceptible to un-commanded discharges compared to other similar guns in the industry.

19.    Sig Sauer's design and manufacture of the P320 renders the weapon unreasonably dangerous for its intended uses and for any foreseeable uses, including normal carrying, holstering, un-holstering, normal handling, and/or rough handling in an altercation or combat. This was true at the time Mr. Coleman purchased his P320.

*Sig Sauer's false and misleading marketing of the P320*

20.    At the times relevant to this lawsuit, Sig Sauer did not warn, advise, or tell consumers about the increased likelihood of un-commanded discharges with the P320 due to its defective design and manufacture. This includes, but is not limited to, a failure to warn consumers about the absence of any external safety features.

21.    At the times relevant to this lawsuit, the P320 Operator's Manual never disclosed to consumers that the P320 (1) lacks any external safety features that are available on other firearms, and (2) the P320 has a higher risk of un-commanded discharges due to the absence of an external safety feature. Thus, the Operator's Manual never explains additional precautions that consumers can take to ensure that they can experience a "high level of safety" as marketed by Sig Sauer.

22.    At the times relevant to this lawsuit, the Operator's Manual also advised consumers that the P320 "comes equipped with effective, well-designed safety features" and

COMPLAINT AND DEMAND FOR JURY TRIAL - 5

that "[m]any safeties are incorporated into your firearm." But it never warns consumers that the P320 lacks external safety features available on other firearms. Without this corresponding warning about what the P320 lacks, Sig Sauer's promises of a safe gun are meaningless.

23. At the times relevant to this lawsuit, Sig Sauer was silent about the P320's absence of external safety features and omitted any instructions about how to properly and safely use the P320 with the understanding that there are no external safety features.

24. At the times relevant to this lawsuit, Sig Sauer stated that the P320 "is offered with an optional ambidextrous manual safety." But Sig Sauer omits any information about the enhanced safety steps a consumer should use if the P320 does not have a manual safety, nor does it provide any warning about the absence of a manual safety. Rather, it merely advises about the option of a manual safety without discussing any of the consequences of carrying a firearm without one.

25. Contrary to the omissions and lack of warnings above, Sig Sauer markets the P320 to the consumer as a safe firearm:

## SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.



26.    Sig Sauer also markets the P320 with the express representation that the striker safety "[p]revents the striker from being released unless the trigger is pulled."

27.    Sig Sauer affirmatively told the U.S. Army that its design of the Sig Sauer P320 with the inclusion of a manual thumb safety would mitigate the risk of un-commanded discharges caused by trigger actuation.

28.    The vast majority of Sig Sauer P320 models sold to law enforcement and law-abiding citizens do not come with a manual thumb safety as an option.

29.    To this day, Sig Sauer continues to falsely market and misrepresent material facts to the public and its consumers that the P320 is a safe and reliable gun. Sig Sauer has a dedicated website for false and misleading marketing called P320truth.com. Sig Sauer states that the webpage provides "[t]he Truth About SIG SAUER P320 | Official Information." The website provides five facts Sig Sauer expressly represents to be true on the webpage. Those facts include:

> "FACT #1: The P320 is subjected to rigorous testing by military and law enforcement agencies worldwide and has consistently proven to be safe and reliable"

COMPLAINT AND DEMAND FOR JURY TRIAL - 7

"FACT #2: The P320 meets and exceeds all industry safety standards, including the U.S. Army's stringent requirements for its Modular Handgun System"

"FACT #3: Every P320 undergoes multiple quality control checks before leaving the factory to ensure it meets SIG SAUER's high standards for safety and performance."

"FACT #4: The P320's trigger safety mechanism prevents discharge unless the trigger is deliberately pulled."

"FACT #5: SIG SAUER has a proven track record of addressing customer concerns and continuously improving their products."

30.    Sig Sauer knows the five facts listed on P320truth.com are materially false, misleading and likely to be reasonably relied upon by its consumers.

## Palmetto State Armory's marketing of the P320

31.    Palmetto State Armory also markets to the public and its consumers that the P320 is a safe gun.



Search PSA by Keyword...

## SIG SAUER P320

Check out our top-quality pistols and accessories, made to be reliable and easy to use. Whether you're experienced or new to shooting, we have P320 models in different sizes, full-size, compact, and subcompact so you can find the one that fits you best. We also offer a variety of magazines, holsters, grips, and upgrade kits to help you get the most out of your firearm. All our products come from trusted brands, so you know they're safe and high-quality. Shop with us to find the right P320 or accessory for self-defense, competition, or fun at the range. We offer fast shipping and helpful customer service to make your shopping easy.

*Sig Sauer's knowledge of and conscious disregard of the unreasonably dangerous nature of the P320*

32.    Sig Sauer knew, as early as 2016 and possibly earlier, that un-commanded discharges caused by un-commanded trigger actuation was a known risk of the P320's design, as testified to by Matt Taylor, one of the P320's chief designers.

33. Sig Sauer also knew that un-commanded trigger actuation by a foreign object coming into contact with the P320 trigger could result in an un-commanded discharge causing death.

34.    Sig Sauer also knew that holstering and unholstering a pistol without any external safety and with a smaller trigger guard gap could result in an un-commanded discharge.

35.    Sig Sauer knew that the risks of the P320s design could result in the death of its users.

36.    Sig Sauer had knowledge long before Mr. Coleman purchased his P320 that the P320 was capable of firing by itself without the trigger being deliberately pulled due to defective components and/or the lack of necessary safety features, including but not limited to: a manual safety, a tabbed trigger safety, and/or a grip safety.

37.    For many years since the weapon was first introduced to the market in 2014, Sig Sauer has recklessly failed to recall the P320 despite knowing of countless wounds/injuries inflicted upon users due to un-commanded discharges of the P320.

38.    In 2016-17, the United State Military required that Sig Sauer conduct a Failure Modes and Effects Criticality Analysis. One of the risks identified by the FMECA was the unintended trigger actuation by a foreign object. Despite the findings of the FMECA, Sig Sauer

continued to produce and sell the P320 to consumers without any external safety knowing the omission of an external safety created an unreasonable risk with un-commanded discharges.

39.    In 2017, Sig Sauer initiated a "Voluntary Upgrade Program" in response to complaints about un-commanded discharges when the P320 was dropped and discharged "out of battery," meaning the gun's slide was not aligned with the body of the firearm.

40.    As a part of the Voluntary Upgrade Program, Sig Sauer "updated" the P320's slide and its trigger, but it did not add a safety feature to the trigger nor did it add a manual safety. Sig Sauer merely updated the trigger to a "reduced mass trigger" with a "thinner profile."

41.    Sig Sauer's Voluntary Upgrade Program did not enhance the firearm's external safety features because it neither added a trigger toggle nor a manual safety. In effect, the Sig Sauer Voluntary Upgrade Program did nothing to change the external safety features of the P320.

42.    Sig Sauer's Voluntary Upgrade Program expressly represents to consumers in the "Questions and Answers" section that "the P320 meets and exceeds all US safety standards..."; and that "[t]his is a voluntary service, as the P320 meets and exceeds all ANSI/SAAMI, NIJ, DOJ, California, Massachusetts, and safety standards. Sig Sauer welcomes all of its P320 owners to take advantage of this program."

43.    Sig Sauer's Voluntary Upgrade Program demonstrates that Sig Sauer not only continued to know about the un-commanded discharge defect in 2017, but also that it continued to allow the defect to go without a remedy. Sig Sauer has continued selling the defective P320 since 2016, since the Voluntary Upgrade Program, and to this day.

44.    The fact that Sig Sauer's Voluntary Upgrade Program did not remedy the known defect in the P320 is inherent in the number of publicly reported un-commanded discharges of the P320 and lawsuits filed since the time of the Voluntary Upgrade Program.[1]

45.    Other instances of the P320 discharging without a trigger pull (in both its original and redesigned form) and sometimes when holstered have been reported in legal filings in other lawsuits, including but not limited to:

> i. In May 2018, civilian Gunter Walker of Oklahoma reported to SIG Sauer that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.
>
> ii. In June 2018, a police officer in Williams County, Ohio, reported that his P320 discharged un-commanded twice in one moment as he was attempting to move the slide backward. One round grazed the officer's arm; the other blew through his patrol car's driver side door.
>
> iii. In May 2018, a police officer in Rancho Cucamonga, California, reported that his P320 fired un-commanded while he was walking inside his department locker room.

---

1 Herman v. Sig Sauer W.D. Okla. 21-CV-1038 October 25, 2021
Frankenberry v. Sig Sauer D. S.C. 19-CV-2990 October 22, 2019
Hoefs v. Sig Sauer W.D. Wash. 20-CV-5173 February 26, 2020
Schneider v. Sig Sauer D. N.H. 20-CV-1190 December 18, 2020
Green-Berrios v. Sig Sauer D. P.R. 22-CV-1002 January 4, 2022
Vadnais v. Sig Sauer D. Conn. 18-CV-605 April 9, 2018
Powers v. Sig Sauer M.D. Fla. 20-CV-2026 August 28, 2020
Haynes v. Sig Sauer N.D. Ga. 20-CV-4218 October 13, 2020
Lang v. Sig Sauer N.D. Ga. 21-CV-4196 October 11, 2021
Williams v. Sig Sauer E.D. Ky. 20-CV-78 May 22, 2020
Davis v. Sig Sauer E.D. Ky. 22-CV-10 February 1, 2022
Mayes v. Sig Sauer W.D. Ky. 19-CV-146 October 16, 2019
Ahern v. Sig Sauer D. Mass. 21-CV-11007 June 16, 2021
Collette v. Sig Sauer D. Mass. 21-CV-11392 August 25, 2021
Campbell v. Sig Sauer W.D. Mo. 21-CV-5047 May 19, 2021
Guay v. Sig Sauer D. N.H. 20-CV-736 July 2, 2020
Colwell v. Sig Sauer N.D.N.Y. 21-CV-1200 November 2, 2021
Slatowski v. Sig Sauer E.D. Pa. 21-CV-729 February 17, 2021
Hilton v. Sig Sauer E.D. Tex. 21-CV-441 August 16, 2021
Watson v. Sig Sauer N.D. Tex. 21-CV-106 January 29, 2021
Vadnais v. Sig Sauer E.D. Va. 18-CV-540 May 4, 2018
Jinn v. Sig Sauer S.D.N.Y. 20-CV-1122 February 10, 2020

iv. In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Morrow, Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

v. In December 2018, civilian Robert Lang's P320 fired on him un-commanded in Georgia, causing severe tunneling wounds to his right leg.

vi. In May 2019, Cambridge, Massachusetts Lt. Commander Thomas Ahern's P320 fired un-commanded inside a SWAT van near Harvard Square.

vii. On July 23, 2019, a P320 fired un-commanded on Officer Walter Collette, Jr. of the police department of Somerville, Massachusetts, hitting him in his leg and causing substantial injuries.

viii. On July 24, 2019, a P320 fired un-commanded on Jimmy S.C. Jinn, a United States Homeland Security Agent, at a firing range in the Bronx, New York, resulting in permanent nerve damage to his leg.

ix. In August 2019, Philadelphia Transit Officer Craig Jacklyn's P320 fired un-commanded while holstered, nearly hitting a bystander in the subway.

x. On September 3, 2019, another P320 in use by the sheriff's office in Loudoun County Virginia fired un-commanded on another deputy sheriff, Carl Costello, hitting him in his leg.

xi. On October 10, 2019, Cambridge, Massachusetts Officer Jacques Desrosiers's P320 discharged un-commanded. The round caused life-changing injuries to Officer Desrosiers.

xii. On October 11, 2019, a P320 fired un-commanded on United States Veterans Affairs police officer Frank J. Kneski in New Jersey, striking him beneath his lower back as he was un-holstering the weapon.

xiii. On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the police department in Manteca, California, as he was preparing for work. The P320 discharged un-commanded inside his holster as Officer Gardette attempted to fasten his duty belt around his waist. The round blew out the

bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and a fellow officer by inches as it ricocheted into a locker door. The entire event was eye witnessed and reduced to writing by Gardette's partner.

xiv. On December 2, 2019, a P320 fired un-commanded while in the possession of Cambridge Police Department Detective David Albert, as he was in the process of putting on his duty belt in Cambridge, Massachusetts.

xv. In January 2020, a fully holstered P320 fired un-commanded on an Army veteran, Tanner Larson, in Utah, penetrating his leg and impacting his femur bone.

xvi. On February 27, 2020, a fully holstered P320 fired un-commanded on a retired Tampa police officer, Robert Northrop, causing catastrophic bone damage to his lower left leg.

xvii. In June 2020, a P320 fired un-commanded on an officer in Pasco County, Florida, severely wounding him in his right leg. This incident was the third un-commanded discharge experienced by Pasco County officers since 2019.

xviii. On July 14, 2020, a P320 fired un-commanded on the partner of an officer who was attempting to subdue a suspect in Milwaukee, Wisconsin, causing him serious injury.

xix. On September 21, 2020, a P320 fired un-commanded on a United States Immigration and Customs Enforcement agent at a firing range in Maryland, striking him in the leg and causing serious injury. The weapon discharged when the ICE agent placed his hand on the grip to the draw gun.

xx. On November 5, 2020, a P320 fired un-commanded on a member of Canada's elite Joint Task Force 2, causing him bodily harm.

xxi. On November 9, 2020, a P320 fired un-commanded on Officer Jerry Wyche of the Tampa Police Department while he was sitting in his patrol car. His partner in the passenger seat witnessed the weapon fire without Wyche doing anything to make it fire.

xxii. In December 2020, a P320 fired un-commanded on a second ICE agent at a firing range in Tennessee. The bullet resulted in a

tunnel wound to her right thigh.

xxiii. On December 1, 2020, a fully holstered P320 discharged un-commanded while inside a sex crimes detective's handbag in Bridge City, Texas. The bullet entered millimeters away from her vagina and exited her bottom, leaving inoperable shrapnel near and around her sciatic nerve.

xxiv. In January 2021, a P320 again fired un-commanded on an undercover officer in Milwaukee, Wisconsin as he stood to get out of the car. The discharge is captured on parking lot surveillance video. Both the officer's hands were full.

xxv. On May 12, 2021, a P320 fired un-commanded on a second Homeland Security Investigations ("HSI") agent conducting firearms training at a range in Cottage Grove, Minnesota without the trigger being pulled. The bullet left two entry and exit wounds in her right thigh and calf and shattered her fibula.

xxvi. On May 15, 2021, a fully holstered P320 fired un-commanded on a DC Metro Transit police department officer inflicting thermal burns along her right thigh.

xxvii. In June 2021, the Pasco County, Florida, Sherriff's Office replaced its entire arsenal of P320s with Glock 19s after four separate incidents of its P320s discharging un-commanded, striking two officers in their respective legs causing significant injuries.

xxviii. In June 2021, a P320 fired un-commanded on a police officer at a firing range in Troy, New York, severely injuring his right leg.

xxix. On June 22, 2001, a P320 fired un-commanded on an HSI agent in Tameling, Guam.

xxx. On or about August 4, 2021, a P320 fired un-commanded on an ICE agent transporting a prisoner to Saint Clare County Jail in Detroit, Michigan. This incident was captured on video. A still photo of the moment of discharge shows that the agent's finger was entirely outside the holstered P320 when it fired. Black gunpowder mist can be seen exiting the bottom of the holster over his khaki duty pants:



46.    Due to the defective design of the P320, government agencies began conducting

their own investigations into the safety of the P320, which resulted in agencies banning government employees and agents use of the gun. Internal documents from the U.S. Immigration and Customs Enforcement agency report that between June 4, 2019, and October 1, 2020 there were a total of 12 unintentional discharges of the P320 throughout the agency. On Juley 21, 2025, the Department of the Air Force issued a memorandum that paused the use of Sig Sauer's M18.

47.    Sig Sauer also has knowledge of the P320s defective design and manufacture from numerous lawsuits, wherein it has hired experts and lawyers to attend inspections of the P320 where it was shown that the P320 is defectively designed and manufactured. This includes, but is not limited to, an inspection in Belcamp, Maryland on December 7, 2018, that was attended by Sig Sauer's lawyer Robert Kelly and Sig Sauer's expert Michael Knox, an inspection in March 2021 at the North Star Imaging facility in Marlborough, Massachusetts, and an inspection in January 2022, also at Marlborough, Massachusetts, that was attended by Sig Sauer's expert Derek Watkins and Sig Sauer's SIG's lawyer Kristen Dennison.

48.    Prior to this incident, Palmetto State Armory was also aware of public complaints that the P320 fired without the trigger being pulled or being deliberately actuated by the user as those reports of un-commanded discharges were publicly available.

*The P320's defective design severely injured Mr. Coleman*

49.    On approximately November 5, 2019, Mr. Coleman purchased a Sig Sauer P320 X5 Legion pistol, serial number 58H189715 online from Palmetto State Armory (hereinafter "Defendant" or "Palmetto State Armory").

50. On Tuesday, May 14, 2024, Mr. Coleman attended training at Shaw Shooting Advanced Law Enforcement Firearms Training, located at the Shaw training company ground 834 East 2700 South, Hagerman, Idaho.

51. The training was a 5-day course that began on Monday, May 13, 2024 and ended on Friday, May 17, 2024. The training consisted of handgun and rifle instruction, followed by shooting on paper targets and steel targets.

52. Participants of the Shaw Shooting Advanced Law Enforcement Firearms Training included members of the Nampa Police Department and the United States Air Force Pararescue soldiers.

53. On the morning of Tuesday, May 14, 2024, participants started training on the paper target range and were given instruction followed by shooting on paper targets.

54. Following a lunch break, participants split into multiple groups with 5 officers per group.

55. Each group started on a steel target shooting range and then would rotate after approximately one hour of instruction and training.

56. Each range consisted of a firearms instructor who provided range instruction, oversight, and safety.

57. Mr. Coleman's group consisted of Lieutenant Jason Cantrell, Jamie Burns, Chris Berrier, Aaron Coleman, and Eric Duke.

58. During early afternoon hours, the participants had rotated to the second evolution of training at a steel knock down plate rack.

59. The instructor, Charles Tate Moots, provided a safety brief along with the course of fire.

COMPLAINT AND DEMAND FOR JURY TRIAL - 17

60.     The range was separated into multiple lanes of fire, and the intent of the course was to knock down 8 circle targets from left to right.

61.     The shooter's partner would then pull a rope to reset the targets, and the shooter would then knock down the same 8 targets, this time going right to left.

62.     Each of the five participants in the group had conducted the shooting course multiple times.

63.     During the practice session, Mr. Coleman was working with Lt. Cantrell as his shooting partner.

64.     Mr. Coleman shot the initial 8 targets, Lt. Cantrell reset the course with the rope, and Mr. Coleman shot the next 8 targets.

65.     Mr. Coleman finished shooting, scanned his target, and holstered his firearm.

66.     Mr. Coleman then turned to his right and began to bend down, reaching down with his right hand to grab the rope and reset the steel plates to the upright shooting position.

67.     When Mr. Coleman was within inches of the rope, the P320 suddenly and unexpectedly discharged while holstered.

68.     Mr. Coleman did not touch the P320's trigger and did not intend to fire the firearm.

69.     The bullet struck Mr. Coleman in his lower right leg and traveled through his right foot, causing substantial injury, maceration of tissue, blood loss, and nerve damage, along with severe emotional trauma.

70.     While the full extent of the physical damage to his right leg and foot is not yet known, Mr. Coleman has and will likely continue to have trouble running, sitting, or standing. Upon information and belief, Mr. Coleman will never be able to return to his pre-incident form

as a result of diminished physical capacity.

71.    As a direct and proximate result of Defendants' negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Mr. Coleman suffered and continues to suffer from serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Mr. Coleman has in the past and is reasonably likely to require medicines, medical care and treatment. Mr. Coleman has in the past and may in the future continue to be compelled to expend money and incur further obligations for such medical care and treatment. Mr. Coleman has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Mr. Coleman has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Mr. Coleman's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Mr. Coleman, who has received substantial and ongoing treatments and medicines.

## COUNT ONE

### STRICT PRODUCT LIABILITY - SIG SAUER

72.    Plaintiffs reallege and incorporate by this reference all the allegations contained in Paragraphs 1-71.

73.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

a.    Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Mr. Coleman;

b.    The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

c.    The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d.    The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

74.    The P320 was in a defective condition as: (1) the danger contained therein was unknowable and unacceptable to the average or ordinary consumer; and/or (2) a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

75.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

76.    The defective condition of the P320 caused Mr. Coleman's injuries.

77.    Sig Sauer is therefore strictly liable to Plaintiffs.

78.    As a direct result of Sig Sauer's acts, Plaintiffs have suffered damages in excess of $10,000.00 to be proven with specificity at trial.

79.    Sig Sauer's conduct was reckless and outrageous as alleged hereinabove, constituting an extreme deviation from reasonable standards of conduct, and Sig Sauer's conduct was performed with an understanding of, or disregard for, its likely consequences.

80.    Plaintiffs reserve this paragraph for the inclusion of a claim of punitive

COMPLAINT AND DEMAND FOR JURY TRIAL - 20

damages under Idaho Code § 6-1604.

81.    Plaintiffs are entitled to recover their attorney fees and costs incurred in the prosecution of this action pursuant to Idaho Code §§ 12-120, 12-121, Idaho Rules of Civil Procedure 54(d) and 54(e), and all other applicable state law.

82.    Should damages be awarded by a jury with regards to this claim, Plaintiffs should recover double damages against Sig Sauer pursuant to Idaho Code § 18-3307, as Sig Sauer is the offending party which caused Mr. Coleman' injury by the discharge of a firearm.

## COUNT TWO

### NEGLIGENCE - SIG SAUER

83.    Plaintiffs reallege and incorporate by this reference all the allegations contained in Paragraphs 1-82.

84.    At all relevant times, Sig Sauer owed Plaintiffs the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

85.    At all relevant times, Sig Sauer owed Plaintiffs the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull or to prevent un-commanded discharges before selling the gun and placing it into the stream of commerce.

86.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiffs, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and

research, industry publications and research, and other sources of information to be developed in discovery.

87.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

a.    By failing to use due care in designing and manufacturing the P320's firing  and striker assembly to prevent un-commanded discharges;

b.    By failing to use due care in designing the P320 by failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

c.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

d.    By failing to use due care in designing and manufacturing the P320's internal components to prevent un-commanded discharges due to a rollover defect;

e.    By failing to issue a mandatory recall of the P320 as Sig Sauer and other gun manufacturers in the industry have done in the past with other defective products;

f.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the P320's propensity to discharge un-commanded as described above;

g.    By negligently failing to unambiguously warn purchasers and end users of the P320, including Mr. Coleman, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

h.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the P320's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

i.    By negligently failing to place a warning about "vibration" of the P320 leading to unintended discharge in a conspicuous manner which could be easily understood by a consumer;

j.    Other negligent acts and omissions to be developed in the course of discovery.

88.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the P320 would or could give rise to serious bodily injuries to such users, up to and including death.

89.    The P320's defective condition was not visible and Mr. Coleman was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

90.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the May 14, 2024 un-commanded discharge of the P320 and Mr. Coleman's injuries.

91.    As a direct and proximate result of the negligence set forth in this Count, Plaintiffs suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Plaintiffs will suffer such losses and impairments in the future.

92. As a direct result of Sig Sauer's acts, Plaintiffs have suffered damages in excess of $10,000.00 to be proven with specificity at trial.

93. Sig Sauer's conduct was reckless and outrageous as alleged hereinabove, constituting an extreme deviation from reasonable standards of conduct, and Sig Sauer's conduct was performed with an understanding of, or disregard for, its likely consequences.

94. Plaintiffs reserve this paragraph for the inclusion of a claim of punitive damages under Idaho Code § 6-1604.

95. Plaintiffs are entitled to recover their attorney fees and costs incurred in the prosecution of this action pursuant to Idaho Code §§ 12-120, 12-121, Idaho Rules of Civil Procedure 54(d) and 54(e), and all other applicable state law.

96. Should damages be awarded by a jury with regards to this claim, Plaintiffs should recover double damages against pursuant to Idaho Code § 18-3307, as Sig Sauer is the offending party which caused Mr. Coleman' injury by the discharge of a firearm.

## COUNT THREE

### BREACH OF WARRANTIES – SIG SAUER

97. Plaintiffs reallege and incorporate by this reference all the allegations contained in Paragraphs 1-96.

98. Sig Sauer was a merchant with regards to the P320.

99. In marketing and selling the P320, Sig Sauer expressly and impliedly warranted that it was reasonably safe, was of merchantable quality, was free from design, manufacturing, and/or modification defects, and was reasonably fit for its ordinary, intended, foreseeable, and expected use, and that such use would not cause injuries of the nature suffered by Mr. Coleman.

COMPLAINT AND DEMAND FOR JURY TRIAL - 24

100. Sig Sauer knew or should have known that consumers would use and be subject to the use of the P320 and would rely upon the representations, skill and judgment of Sig Sauer, in furnishing products suitable for such purpose. These warranties were made for the purpose and effect of inducing the public to purchase and use the P320.

101. The defects were not known to Plaintiffs while Sig Sauer knew or should have known of the dangerous, defective, unfit and unsafe condition of the P320. As such, Sig Sauer breached the express and implied warranties made regarding the P320.

102. Sig Sauer's breach of warranties regarding the P320 was a direct and/or substantial factor in causing the P320 to fail under ordinary use thereof and causing Mr. Coleman's injuries.

103. As a direct result of Sig Sauer's acts, Plaintiffs have suffered damages in excess of $10,000.00 to be proven with specificity at trial.

104. Sig Sauer's actions in selling, marketing, and/or distributing the P320 without alerting, advising, warning, timely and properly recalling, or otherwise adequately informing purchasers and/or users of the P320 of its defective and dangerous nature and/or character, were reckless or willful and constituted a gross deviation from reasonable standards of care.

105. Sig Sauer's conduct was reckless and outrageous as alleged hereinabove, constituting an extreme deviation from reasonable standards of conduct, and Sig Sauer's conduct was performed with an understanding of, or disregard for, its likely consequences.

106. Plaintiffs reserve this paragraph for the inclusion of a claim of punitive damages under Idaho Code § 6-1604.

107. Plaintiffs are entitled to recover their attorney fees and costs incurred in the

COMPLAINT AND DEMAND FOR JURY TRIAL - 25

prosecution of this action pursuant to Idaho Code §§ 12-120, 12-121, Idaho Rules of Civil Procedure 54(d) and 54(e), and all other applicable state law.

108.    Should damages be awarded by a jury with regards to this claim, Plaintiffs should recover double damages against pursuant to Idaho Code § 18-3307, as Sig Sauer is the offending party which caused Mr. Coleman's injury by the discharge of a firearm.

## COUNT FOUR

### *STATUTORY LIABILITY (IMPLIED LIABILITY) – PALMETTO STATE ARMORY*

109.    Plaintiffs reallege and incorporate by this reference all the allegations contained in Paragraphs 1-108.

110.    Alternatively, the distributor of the P320, Palmetto State Armory, was a product distributor as is therefore liable pursuant to Idaho Code § 6-1407(4).

111.    The alternative statutory liability of Palmetto State Armory, pursuant to Idaho Code § 6-1407(4), was the proximate cause of, directly resulted in, and/or substantially contributed to the injuries sustained by Mr. Coleman and his resulting damages, for which Palmetto State Armory is liable.

112.    Should damages be awarded by a jury with regards to this claim, Plaintiffs should recover double damages against pursuant to Idaho Code § 18-3307, as Palmetto State Armory is the offending party which caused Mr. Coleman's injury by the discharge of a firearm.

## COUNT FIVE

### STRICT LIABILITY – PALMETTO STATE ARMORY

113.    Plaintiffs reallege and incorporate by this reference all the allegations contained in Paragraphs 1-112.

114. Upon information and belief, Palmetto State Armory had knowledge of the various defects with the commercial version of the P320 gun years before Mr. Coleman was shot on May 14, 2024.

115. At all relevant times, Palmetto State Armory was engaged in the business of selling firearms, including the P320.

116. Plaintiff purchased his P320 online from Palmetto State Armory on approximately November 5, 2019.

117. Palmetto State Armory, by and through their agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and distributors are strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a. Palmetto State Armory was engaged in the regular business of selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the product which injured plaintiff;

    b. The product involved in the subject incident were marketed and placed in the general stream of commerce by Palmetto State Armory;

    c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce;

    d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

118. The product was in a defective condition as: (1) the danger contained therein is unknowable and unacceptable to the average or ordinary consumer; and/or (2) a reasonable

person would conclude that the probability and seriousness of the harm caused by the product outweigh the burden or costs of taking precautions.

119.    The defective condition of the P320 caused Plaintiff's injuries.

120.    On information and belief, prior to the un-commanded discharge in this case, there had been no substantial or material change in the condition of the product from the time when it was designed, manufactured, sold and/or distributed by defendants.

121.    As a direct and proximate result of the breaches set forth in this Count, Mr. Coleman suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for his care and treatment. These injuries are either permanent or continuing in their nature and Plaintiffs will suffer such losses and impairments in the future.

122.    Palmetto State Armory is therefore strictly liable to Plaintiffs.

123.    As a direct result of Palmetto State Armory's acts, Plaintiffs have suffered damages in excess of $10,000.00 to be proven with specificity at trial.

124.    Palmetto State Armory's conduct was reckless and outrageous as alleged hereinabove, constituting an extreme deviation from reasonable standards of conduct, and Palmetto State Armory's conduct was performed with an understanding of, or disregard for, its likely consequences.

125.    Plaintiffs reserve this paragraph for the inclusion of a claim of punitive damages under Idaho Code § 6-1604.

126.    Plaintiffs are entitled to recover their attorney fees and costs incurred in the prosecution of this action pursuant to Idaho Code §§ 12-120, 12-121, Idaho Rules of Civil

COMPLAINT AND DEMAND FOR JURY TRIAL - 28

Procedure 54(d) and 54(e), and all other applicable state law.

127.    Should damages be awarded by a jury with regards to this claim, Plaintiffs should recover double damages against pursuant to Idaho Code § 18-3307, as Palmetto State Armory is the offending party which caused Mr. Coleman' injury by the discharge of a firearm.

## COUNT SIX

## NEGLIGENCE – PALMETTO STATE ARMORY

128.    Plaintiffs reallege and incorporate by this reference all the allegations contained in Paragraphs 1-127.

129.    At the time Palmetto State Armory sold Mr. Coleman a P320, there had been numerous publicized incidents of the P320 discharging without a deliberate trigger pull.

130.    Despite the fact that Palmetto State Armory knew or should have known that the P320 was dangerously defective, Palmetto State Armory sold it to Mr. Coleman.

131.    Prior to Palmetto State Armory selling the P320 to Mr. Coleman, Sig Sauer had initiated the Voluntary Upgrade Program.

132.    Despite the fact that Palmetto State Armory knew or should have known that Sig Sauer had initiated the Voluntary Upgrade Program, Palmetto State Armory sold Mr. Coleman a gun and did not advise him of the upgrade program.

133.    The negligence, gross negligence, carelessness, recklessness, and other wrongful and liability-producing conduct of Palmetto State Armory, its agents, servant, and/or employees which was a proximate cause of the incident described herein, consisted of, but is not limited to, the following:

   a.    Failing to use due care by selling a handgun publicly known to be dangerously defective.

COMPLAINT AND DEMAND FOR JURY TRIAL - 29

b.    Failing to use due care by selling a dangerously defective handgun.

c.    Failing to warn customers, such as Mr. Coleman, that the P320 was publicly known to be dangerously defective.

d.    Failing to notify Mr. Coleman of the Voluntary Upgrade Program.

180.   As a direct and proximate result of the breaches set forth in this Count, Plaintiffs suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, nursing, attendant care and life care expenses for care and treatment. These injuries are either permanent or continuing in their nature and Plaintiffs will suffer such losses and impairments in the future.

134.   As a direct result of Palmetto State Armory's acts, Plaintiffs have suffered damages in excess of $10,000.00 to be proven with specificity at trial.

135.   Palmetto State Armory's conduct was reckless and outrageous as alleged hereinabove, constituting an extreme deviation from reasonable standards of conduct, and Sig Sauer's conduct was performed with an understanding of, or disregard for, its likely consequences.

136.   Plaintiffs reserve this paragraph for the inclusion of a claim of punitive damages under Idaho Code § 6-1604.

137.   Plaintiffs are entitled to recover their attorney fees and costs incurred in the prosecution of this action pursuant to Idaho Code §§ 12-120, 12-121, Idaho Rules of Civil Procedure 54(d) and 54(e), and all other applicable state law.

138.   Should damages be awarded by a jury with regards to this claim, Plaintiffs

should recover double damages against pursuant to Idaho Code § 18-3307, as Palmetto State Armory is the offending party which caused Mr. Coleman' injury by the discharge of a firearm.

## COUNT SEVEN

### BREACH OF WARRANTIES – PALMETTO STATE ARMORY

139.  Plaintiffs reallege and incorporate by this reference all the allegations contained in Paragraphs 1-138.

140.  Palmetto State Armory was a distributor with regards to the P320.

141.  In selling the P320, Palmetto State Armory expressly and impliedly warranted that it was reasonably safe, was of merchantable quality, was free from design, manufacturing, and/or modification defects, and was reasonably fit for its ordinary, intended, foreseeable, and expected use, and that such use would not cause injuries of the nature suffered by Mr. Coleman.

142.  Palmetto State Armory knew or should have known that consumers would use and be subject to the use of the P320 and would rely upon the representations, skill and judgment of Palmetto State Armory, in furnishing products suitable for such purpose. These warranties were made for the purpose and effect of inducing the public to purchase and use the P320.

143.  The defects were not known to Plaintiffs while Palmetto State Armory knew or should have known of the dangerous, defective, unfit and unsafe condition of the P320. As such, Palmetto State Armory breached the express and implied warranties made regarding the P320.

144.  Palmetto State Armory's breach of warranties regarding the P320 was a direct and/or substantial factor in causing the P320 to fail under ordinary use thereof and

COMPLAINT AND DEMAND FOR JURY TRIAL - 31

causing Mr. Coleman's injuries.

145.    As a direct result of Palmetto State Armory's acts, Plaintiffs have suffered damages in excess of $10,000.00 to be proven with specificity at trial.

146.    Palmetto State Armory's actions in selling, marketing, and/or distributing the P320 without alerting, advising, warning, timely and properly recalling, or otherwise adequately informing purchasers and/or users of the P320 of its defective and dangerous nature and/or character, were reckless or willful and constituted a gross deviation from reasonable standards of care.

147.    Palmetto State Armory's conduct was reckless and outrageous as alleged hereinabove, constituting an extreme deviation from reasonable standards of conduct, and Palmetto State Armory's conduct was performed with an understanding of, or disregard for, its likely consequences.

148.    Plaintiffs reserve this paragraph for the inclusion of a claim of punitive damages under Idaho Code § 6-1604.

149.    Plaintiffs are entitled to recover their attorney fees and costs incurred in the prosecution of this action pursuant to Idaho Code §§ 12-120, 12-121, Idaho Rules of Civil Procedure 54(d) and 54(e), and all other applicable state law.

150.    Should damages be awarded by a jury with regards to this claim, Plaintiffs should recover double damages against pursuant to Idaho Code § 18-3307, as Sig Sauer is the offending party which caused Mr. Coleman's injury by the discharge of a firearm.

## COUNT EIGHT

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS/LOSS OF CONSORTIUM
### (ALL DEFENDANTS)

151. Plaintiffs reallege and incorporate by this reference all the allegations contained in Paragraphs 1 through 150 above as if set out in full.

152. By their actions detailed herein above, Defendants have negligently and/or intentionally caused Plaintiffs to suffer extreme mental anguish and emotional distress which distress has resulted in physical manifestations including insomnia, depression and anxiety.

153. By their actions detailed herein above, Defendants have negligently and/or intentionally caused Mendy Coleman to suffer injury in the form of loss of consortium due to the impact of Aaron Coleman's injury on Plaintiffs' marital relationship.

154. As such, Plaintiffs are entitled to recover monetary damages from the Defendants representing fair and reasonable compensation for the emotional distress suffered by Plaintiffs as a result of the wrongful conduct alleged hereinabove in an amount in excess of $10,000.00 to be proven at trial.

155. Plaintiffs reserve this paragraph for the inclusion of a claim of punitive damages under Idaho Code § 6-1604.

156. Plaintiffs are entitled to recover their attorney fees and costs incurred in the prosecution of this action pursuant to Idaho Code §§ 12-120, 12-121, Idaho Rules of Civil Procedure 54(d) and 54(e), and all other applicable state law.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of no less than twelve (12) persons on all issues so triable pursuant to Idaho Rule of Civil Procedure 38(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for Judgment of this Court as follows:

1.      For money damages for Plaintiffs from Defendants under the theories of negligence, strict product liability, statutory liability, breach of warranties, and negligent/intentional infliction of emotional distress in a sum to be determined at trial in excess of $10,000.00, and representing Plaintiffs' economic damages relating to lost contribution of services, past and future medical, psychological and counseling care and expenses, pain and suffering, emotional distress, loss of enjoyment of life, lost wages, and property damage;

2.      For Plaintiffs' reasonable attorney fees necessitated in this action pursuant to Idaho Code §§ 12-120 and 12-121, Idaho Rules of Civil Procedure 54(d) and 54(e), and all other applicable state law;

3.      For costs of suit incurred herein; and

4.      For such other and further relief as to the Court is just and equitable.

DATED this _30th_ day of July, 2025.

ROSSMAN LAW GROUP, PLLC

Mallam J. Prior
Attorneys for Plaintiffs

Z:\Work\C\Coleman, Aaron\Pleadings\Complaint.docx

COMPLAINT AND DEMAND FOR JURY TRIAL - 34